OPINION
{¶ 1} Appellant, Steven W. Boldin ("Mr. Boldin"), appeals from a judgment of the Chardon Municipal Court convicting him of domestic violence and disorderly conduct following a bench trial. For the following reasons, we affirm.
 {¶ 2} Substantive Facts and Procedural History
 {¶ 3} On June 24, 2007, Mr. Boldin was arrested for domestic violence after a neighbor called 911 to report that Mr. Boldin punched Deborah Lipstreu ("Ms. Lipstreu") on the patio of the house shared by Mr. Boldin and Ms. Lipstreu. Mr. Boldin was *Page 2 
subsequently charged with domestic violence, in violation of R.C. 2919.25(A), a misdemeanor of the first degree, and disorderly conduct, in violation of R.C. 2917.11(A)(1), a minor misdemeanor.
 {¶ 4} At the bench trial, Ms. Lipstreu testified that she began living with Mr. Boldin on December 9, 2006. She testified about a series of domestic altercations between the couple, the first occurring on December 10, 2007, when he was upset about a friend who drove her home that day. Mr. Boldin stabbed the wall with a knife and "slapped and hit [her] a few times."
 {¶ 5} Ms. Lipstreu testified that during the evening of January 3, 2007, he struck her again, and she had to jump out of the bedroom window to get away. Her kids called 911. After the police officers left and she returned to the house, he said "[f]amily don't do that to family," and "shoved [her], pushed [her] into the table, and threw [her] into a bathtub, choked [her], [and] broke a dresser [while] pushing [her] into the dresser."
 {¶ 6} Ms. Lipstreu testified that on February 21, 2007, she was "hit, punched, shoved, choked again" with her "[h]ead banged against the wall." On March 10, 2007, she got "punched, hit, choked, [and her] nose [was] bit." On both of these occasions, Mr. Boldin told her he loved her so much that he was going to hurt her before she hurt him. In April of 2007, he again "punched, hit, [and] slapped" her.
 {¶ 7} Ms. Lipstreu testified that on May 25, 2007, Mr. Boldin was unhappy with her because she had been out with friends. He threw her and she "flew across the living room on to the mattress on the floor that [they] slept on, and [her] head was repeatedly banged off the wall and [she] was choked so badly that [she] couldn't swallow for quite a while." She also suffered a black eye. She testified on that occasion *Page 3 
she was also punched in her ovaries. When she asked Mr. Boldin later why he was punching her ovaries, he said that "the reason [a woman's ovaries are] on the inside of [her] body is that they're more sensitive than a man's ball sac, that's why there are on the inside."
 {¶ 8} None of these incidents were reported to the police, other than the January 3, 2007 call to 911.
 {¶ 9} On June 24, 2007, Mr. Boldin and Ms. Lipstreu argued about whether he should move in with her to her new apartment. They were both consuming alcohol. A friend of Ms. Lipstreu's was also in the house. When Ms. Lipstreu wanted to leave, Mr. Boldin would not let her leave, and would not give her friend the keys to the car either. After her friend left, Ms. Lipstreu again attempted to leave, but Mr. Boldin would not let her. She threw a bag of Doritos at him, and tried to get out through the sliding door. Mr. Boldin threw her to the patio and, while she was on the ground, Mr. Boldin punched her "with a closed fist to the head, [and] to the chest" between ten or twenty times.
 {¶ 10} Mr. Boldin then pulled her back to the house. As he pulled her by her waist back into the kitchen, she saw a knife on the kitchen counter. She took it and stabbed Mr. Boldin in the back of his right arm and then ran out of the house.
 {¶ 11} An ambulance later arrived and took Ms. Lipstreu to the hospital. She was examined but refused treatment for "insurance reasons." She testified that she suffered black eyes and her nose was cracked as a result of this assault.
 {¶ 12} Alan Grysho ("Mr. Grysho"), who had been a part-time police officer for two years, next testified for the state. He testified that he lived next door to the house where the incident occurred, but he did not know either Mr. Boldin or Ms. Lipstreu well. *Page 4 
On June 24, 2007, he received a phone call and sat down in a chair next to a window looking right across to his neighbors' patio, twenty-five feet away. While he talked over the phone, he heard a thud and then heard Mr. Boldin saying "I need your phone." He turned to look out the window and saw Ms. Lipstreu falling backwards on her back. He then observed that Mr. Boldin "bent over and started to punch her in the facial area and chest area," "with a closed fist."
 {¶ 13} Mr. Grysho testified that while Ms. Lipstreu was on her back, with her hands and feet in the air trying to block him from hitting her, Mr. Boldin was "swiping her hands and feet away and punching down on her," and "her head was actually bouncing off the concrete." Mr. Grysho stated that he was in shock to see that happening.
 {¶ 14} Mr. Grysho testified he only saw Mr. Boldin hitting Ms. Lipstreu three or four times because he went to another part of the house to get off the phone so that he could call 911. He testified the person he was on the phone with heard screaming in the background and said, "Wow, you must have your kid there, because I can hear screaming." After he called 911, Mr. Grysho went back to the window and saw Mr. Boldin pulling Ms. Lipstreu back into the house. "It looked like she was trying to stay outside and he was pulling her back in."
 {¶ 15} On cross-examination, the defense counsel asked Mr. Grysho, "Do you think it is possible, from what you witnessed, that Mr. Boldin really wasn't hitting Miss Lipstreu, but pushing, or attempting to push her or shove her away?" To this Mr. Grysho replied, "Absolutely not."
 {¶ 16} Ana Erbeznik ("Ms. Erbeznik") next testified. Ms. Erbeznik knew Mr. Boldin since 2001 when he was dating her sister and she still sees him daily because *Page 5 
he shares a loft for pigeons with her mom. In the past she saw Mr. Boldin with scratches and "road burn" on his face. Mr. Boldin told her that Ms. Lipstreu "ran over him with a car". She further testified that she never saw Ms. Lipstreu with any injuries and that she did not see Ms. Lipstreu after this incident.
 {¶ 17} Mr. Boldin testified in his own behalf and gave a very different account of the altercation. He testified that he and Ms. Lipstreu moved in together six months before the incident. He also testified that he had training as a boxer. Relating the nature of their personal relationship, Mr. Boldin said that Mrs. Lipstreu was the sole provider in their household — she controlled finances and kept tabs on his comings and goings and associations. The day before this incident, she was angry because he did not want to move in with her to her new apartment. On June 24, 2007, they were both consuming alcohol and Ms. Lipstreu became very angry and started to throw things all over the house, most of which were directed at him, including an unopened beer can and an ashtray.
 {¶ 18} Mr. Boldin testified that Ms. Lipstreu also ripped his shirt off and threw a pair of scissors at him, striking him in his arm. He tried to call a friend to pick him up, but Ms. Lipstreu jumped on him, hanging from his neck. He testified that both of them ended up in the patio, and she was hanging on to him, pulling on his shirt and hanging from his neck and scratching it.
 {¶ 19} Mr. Boldin testified at that time he had her purse in his left hand and a phone in his right hand. He tried to keep his shirt from ripping and also tried to knock Ms. Lipstreu off him by using her purse in his hand. He testified that when he went back to the house, Ms. Lipstreu was still hanging onto him. When he tried to dial the phone, *Page 6 
she grabbed a knife and stabbed him in the back of his arm, causing profuse bleeding. Ms. Lipstreu ran away from the house before a police officer arrived. Mr. Boldin testified that because Ms. Lipstreu was already in trouble involving the custody of her children, he wanted to protect her and therefore told the officer he was injured while falling down. The officer arrested him for domestic violence.
 {¶ 20} Erica O'Shay ("Ms. O'Shay") also testified for the defense. She described herself as Mr. Boldin's best friend. She testified that she saw Ms. Lipstreu the day after the incident. Ms. Lipstreu wore a miniskirt and a spaghetti strap tank top with her hair pulled back in a ponytail, and thus she could observe "there was not a mark on her."
 {¶ 21} Also testifying for the defense was Mary Elizabeth Greene ("Ms. Green"), who testified that Mr. Boldin was her loft manager for raising pigeons. She received a telephone call from Ms. Lipstreu at 10:00 on the night of the incident. Ms. Lipstreu told her she stabbed Mr. Boldin, saying, "I had to, * * * he beats me all the time. You should see the bumps on my face and the blood, and my house is full of blood." Ms. Greene stated that she found the statement odd, because she saw Ms. Lipstreu almost daily when she drove Mr. Boldin to the loft, and she never saw any marks on her.
 {¶ 22} The final two witnesses for the defense were Angela Kosie ("Nurse Kosie"), a nurse practitioner offered as an expert in the area of the musculoskeletal system and wounds, and Mr. Boldin's sister, Dawn Baynes.
 {¶ 23} Nurse Kosie testified as to the types of injuries she would expect to see on one hit by a boxer. When shown pictures of Mr. Boldin taken by Ms. O'Shay after the altercation and asked whether the injuries depicted were consistent with being struck by *Page 7 
a beer can, she answered, "could be". When asked by the prosecutor whether a boxer knows how to punch without causing visible injuries, her answer was, "sure".
 {¶ 24} Ms. Baynes offered testimony about Mr. Boldin's relationship with his ex-wife, Gretchen. She said that Gretchen was not afraid of Mr. Boldin and that Gretchen controlled everything in their married life.
 {¶ 25} Following trial, the court found Mr. Boldin guilty of domestic violence and disorderly conduct. For his domestic violence conviction, the court sentenced him to a one hundred eighty day jail term, with one hundred fifty days suspended, and also imposed a fine of $1,000, with $500 suspended. For his disorderly conduct conviction, the court imposed a fine of $150. The court stayed the execution of his sentence pending appeal.
 {¶ 26} Mr. Boldin timely appealed, raising the following assignments of error[1]:
 {¶ 27} "[1.] The trial court erred to the prejudice of defendant-appellant in denying defendant's motion for acquittal on the charges of domestic violence and disorderly conduct when the state failed to present sufficient evidence to sustain a conviction.
 {¶ 28} "[2.] The trial court erred to the prejudice of defendant-appellant when it rejected defendant's claim of self-defense on the charges of domestic violence and disorderly conduct. T.d. 19. *Page 8 
 {¶ 29} "[3.] The court erred to the prejudice of defendant-appellant in finding the defendant guilty of domestic violence and disorderly conduct when he was not the primary aggressor in the dispute and, thus should not have been arrested.
 {¶ 30} "[4.] The trial court erred to the prejudice of defendant-appellant finding the defendant guilty of domestic violence and disturbing the peace when the verdict is against the manifest weight of the evidence.[2]"
 {¶ 31} These four assignments of error relate to his conviction of both domestic violence and disorderly conduct. We address the assignments of error as they relate to his conviction of domestic violence first.
 {¶ 32} Sufficiency of the Evidence
 {¶ 33} In his first assignment of error, Mr. Boldin contends the trial court erred in denying his Crim. R. 29(A) motion for acquittal because the state produced insufficient evidence to support a conviction for domestic violence. Specifically, he argues that the state failed to produce sufficient evidence to prove that (1) he caused or attempted to cause physical harm to Ms. Lipstreu, and that (2) he was a family or household member.
 {¶ 34} A trial court shall grant a motion for acquittal when there is insufficient evidence to sustain a conviction. Crim. R. 29(A). When reviewing a challenge of the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial *Page 9 
and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, at paragraph two of the syllabus. "The pertinent inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
 {¶ 35} A sufficiency challenge requires this court to review the record to determine whether the state presented evidence on each of the elements of the offense. This test involves a question of law and does not permit us to weigh the evidence. State v. Martin (1983),20 Ohio App.3d 172, 175.
 {¶ 36} Here, Mr. Boldin was convicted of domestic violence in violation of R.C. 2919.25(A), which states: "No person shall knowingly cause or attempt to cause physical harm to a family or household member."
 {¶ 37} R.C. 2901.22(B) defines "knowingly" as follows: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 38} In addition, R.C. 2901.01(A)(3) states that: "`Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration."
 {¶ 39} Mr. Boldin argues that the state failed to prove that he knowingly caused or attempted to cause physical harm to Ms. Lipstreu, because there was no evidence showing that Ms. Lipstreu suffered any physical injury. He pointed to the lack of *Page 10 
photographs and hospital records documenting the claimed injuries, and to Ms. Greene's testimony that Ms. Lipstreu showed no visible injuries the next day.
 {¶ 40} Mr. Boldin's claim is without merit. "Serious physical harm" is not an element of domestic violence. Domestic violence merely requires a showing of "physical harm" as defined in R.C. 2901.01(A)(3), which does not require evidence of visible injuries.
 {¶ 41} The record in this case contains Ms. Lipstreu's testimony that Mr. Boldin threw her onto the patio and repeatedly punched her with a closed fist to her head and chest while she was on the ground. The record also contains the testimony of an independent eyewitness with law enforcement training, Mr. Grysho, who saw Ms. Lipstreu falling backwards onto the patio and Mr. Boldin bending over her and punching her in the facial and chest area with a closed fist. Mr. Grysho also observed Mr. Boldin swiping Ms. Lipstreu's hands and feet away while she was on her back and punching down on her. The testimony of Ms. Lipstreu and Mr. Grysho, if believed by a fact-finder, is sufficient evidence to prove that Mr. Boldin knowingly caused or attempt to cause physical harm to Ms. Lipstreu.
 {¶ 42} See, also, State v. Hawn, 11th Dist. No. 2002-P-0042,2003-Ohio-5868 (the state presented sufficient evidence of the element of physical injury where the victim attested that defendant punched her in the eye, and the victim's condition was later corroborated by an investigating officer); State v. Barnes, 8th Dist. No. 87153,2006-Ohio-5239 (even though a victim had no visible injuries after the incident, there was sufficient evidence to support a finding that the victim was physically injured under R.C. 2901.01(A)(3)); State v.Summers, 11th Dist. No. 2002-A-0074, 2003-Ohio-5866 *Page 11 
(testimony from defendant's girlfriend that defendant grabbed her around her neck causing a bruise to appear the next day was sufficient to prove the physical harm element to sustain defendant's domestic violence conviction; it was irrelevant that she failed to seek medical treatment, nobody saw her injury, and no photographs were taken of her bruise);State v. Blonski (1997), 125 Ohio App.3d 103 (a defendant may be found guilty of domestic violence if the victim sustains minor injuries or even no injuries at all).
 {¶ 43} Mr. Boldin also contends the state failed to present sufficient evidence to show that he was a family or household member to warrant a conviction of domestic violence.
 {¶ 44} R.C. 2919.25 provides, in pertinent part:
 {¶ 45} "(F) As used in this section * * * of the Revised Code:
 {¶ 46} "(1) `Family or household member' means any of the following:
 {¶ 47} "(a) Any of the following who is residing or has resided with the offender:
 {¶ 48} "(i) A spouse, a person living as a spouse, or a former spouse of the offender;
 {¶ 49} "* * *
 {¶ 50} "(2) `Person living as a spouse' means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within one year prior to the date of the alleged commission of the act in question."
 {¶ 51} In State v. Williams (1997), 79 Ohio St.3d 459, the Supreme Court of Ohio held that "[t]he essential elements of `cohabitation' are (1) sharing of familial or financial *Page 12 
responsibilities and (2) consortium." Id. at 465. Further, the court explained that "[p]ossible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations." Id. The court held that the weight to be given these factors by the trier of fact is to be determined on a case-by-case basis. Id.
 {¶ 52} The trial transcript in this case contains testimony by both Mr. Boldin and Ms. Lipstreu that they began living together since December of 2006, six months before the incident. Furthermore, Mr. Boldin himself testified that Ms. Lipstreu paid for groceries, utilities, did all the household chores, and handled the finances. He also testified that they had been "intimate" and were living together as "boyfriends and girlfriends." Therefore, sufficient evidence was presented at trial going to the essential elements of (1) shared familial or financial responsibilities and (2) consortium to prove the cohabitation of Mr. Boldin and Ms. Lipstreu.
 {¶ 53} Therefore, when the testimony in the instant record is viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of domestic violence proven beyond a reasonable doubt. Because Mr. Boldin's conviction is supported by sufficient evidence, we overrule his first assignment of error.
 {¶ 54} We next address his claim that the trial court's verdict is against the manifest weight of the evidence.
 {¶ 55} Manifest Weight *Page 13 
 {¶ 56} The court in Martin summarized the standard of review for a manifest weight challenge as follows:
 {¶ 57} "* * * The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 175 (citations omitted).
 {¶ 58} Furthermore, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact to decide. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 59} When assessing the credibility of witnesses, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan (1986), 22 Ohio St.3d 120,123. "[T]he factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." Warren v.Simpson (Mar. 17, 2000), 11th Dist. No. 98-T-0183, 2000 Ohio App. LEXIS 1073, at *8.
 {¶ 60} In this case, Ms. Lipstreu testified that the altercation started when she wanted to leave the house but Mr. Boldin would not let her. She threw a bag of Doritos at him and tried to get out of the sliding door. She was then thrown onto the patio and, while she was on the ground, he punched her with a closed fist to her head and chest ten or twenty times. *Page 14 
 {¶ 61} Mr. Boldin gave a much different account of what had occurred. He testified that the altercation started when Ms. Lipstreu became angry about their future living arrangement. She threw several objects at him, including a beer can, an ashtray and a pair of scissors. She also ripped his shirt. He tried to call a friend to pick him up, but she jumped on him and hung from his neck. While they were on the patio, she continued to hang onto him, pulling his shirt and hanging onto his neck and scratching it. He had to use her purse which he was holding in his hand to knock her off him.
 {¶ 62} This case would have presented a classic "he-said/she-said" domestic violence situation but for the independent eyewitness account provided by Mr. Grysho. He testified that he saw Ms. Lipstreu falling backwards on her back onto the patio and Mr. Boldin bending over her and punching her in the facial and chest area with a closed fist. He swiped her hands and feet away while punching down on her. When asked on cross-examination if it was possible that Mr. Boldin was not hitting Ms. Lipstreu but instead trying to push or shove her away, Mr. Grysho answered, "Absolutely not."
 {¶ 63} Given this evidence, we cannot say that the trial court, in resolving the conflicts in the testimony, lost its way and created such a manifest miscarriage of justice when it gave credence to Ms. Lipstreu's testimony — which was corroborated by an impartial witness — and found Mr. Boldin guilty of domestic violence. Mr. Boldin's fourth assignment of error is without merit.
 {¶ 64} The Self-defense Claim
 {¶ 65} In his second assignment of error, Mr. Boldin asserts that the court erred when it rejected his claim of self-defense. *Page 15 
 {¶ 66} Self-defense is an affirmative defense, for which a defendant bears the burden of proof by a preponderance of the evidence. R.C. 2901.05(A).
 {¶ 67} The elements of self-defense are set forth in State v.Williford (1990), 49 Ohio St.3d 247. To establish self-defense as an affirmative defense, a defendant must establish the following by a preponderance of the evidence: (1) that he "was not at fault in creating the situation giving rise to the affray"; (2) that he "had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of" such force; and (3) that he "must not have violated any duty to retreat or avoid danger." Id. at 249. "The elements of self-defense are cumulative" and, "if the defendant failed to prove any one of these elements by a preponderance of the evidence, he failed to demonstrate that he acted in self-defense." Id.
 {¶ 68} We recognize that self-defense may be asserted as a defense to a charge of domestic violence. However, as the Supreme Court of Ohio explained in State v. Martin (1986), 21 Ohio St.3d 91:
 {¶ 69} "This court, in State v. Poole (1973), 33 Ohio St.2d 18, 19, characterized the defense of self-defense as a `justification for admitted conduct.' Self-defense represents more than a `denial or contradiction of evidence which the prosecution has offered as proof of an essential element of the crime charged * * *.' Id. Rather, we stated inPoole, this defense admits the facts claimed by the prosecution and then relies on independent facts or circumstances which the defendant claims exempt him from liability." Id at 94. *Page 16 
 {¶ 70} Therefore, it is logically and legally inconsistent for Mr. Boldin to deny the facts claimed by the state, namely, he struck Ms. Lipstreu in the patio with a closed fist, while also asserting that he acted in self-defense.
 {¶ 71} Even if we were to review the merit of the self-defense claim, the evidence presented by him fails to support that claim.
 {¶ 72} As the court in City of Cleveland v. Williams, 8th Dist. No. 81369, 2003-Ohio-31 explained,
 {¶ 73} "When reviewing a claim by a defendant that evidence supports his claim of self-defense, the manifest weight standard is the proper standard of review because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability. State v. Martin, [supra]. * * * A defendant's assertion on appeal that he has proven self-defense cannot be a sufficiency claim, but rather, must be reviewed under the standard for a manifest weight claim. State v. Roberts (2000),139 Ohio App.3d 757, 768." Id. at ¶ 10.
 {¶ 74} Here, Mr. Boldin testified that while he and Ms. Lipstreu were on the patio, he used her purse to knock her off him because she was hanging onto him and scratching his neck. His testimony was contradicted by Ms. Lipstreu, who stated Mr. Boldin punched her with a closed fist to her head and chest as she lay on the ground in the patio, consistent with Mr. Grysho's account of the event. Even if his testimony was not contradicted, that evidence does not prove by a preponderance of evidence, among other things, that he had a bone fide belief that he was in imminent danger of great bodily harm and that his only means of escape from such danger was in the use of force. *Page 17 
 {¶ 75} Mr. Boldin's second assignment of error is without merit.
 {¶ 76} Primary Aggressor
 {¶ 77} In the third assignment of error, Mr. Boldin asserts the court erred in rejecting his claim that Ms. Lipstreu was the primary aggressor in the altercation and therefore he should not have been arrested or charged with domestic violence.
 {¶ 78} The issue of who the primary aggressor is in an altercation is not an element of domestic violence. Rather, it relates to the proper procedure a police officer should follow when making an arrest in a domestic violence case. R.C. 2935.032(A) requires local police departments to adopt procedures and policies relating to officer response to an alleged incident of domestic violence in accordance with the provisions of R.C. 2935.03. Section (B)(3)(b) of that statute states, in pertinent part:
 {¶ 79} "If * * * a peace officer has reasonable grounds to believe that the offense of domestic violence * * * has been committed and reasonable cause to believe that family or household members have committed the offense against each other, it is the preferred course of action in this state that the officer, pursuant to division (B)(1) of this section, arrest and detain until a warrant can be obtained the family or household member who committed the offense and whom the officer has reasonable cause to believe is the primary physical aggressor. * * *"
 {¶ 80} In this case, the arresting officer did not testify at trial. However, the record reflects that the 911 call was made by the neighbor, Mr. Grysho, who witnessed Mr. Boldin striking Ms. Lipstreu in the patio area. Presumably the officer determined that Mr. Boldin was the primary aggressor based in part on information reported by Mr. *Page 18 
Grysho. Therefore, the evidence indicates there was reasonable cause for the officer's determination that Mr. Boldin was the primary aggressor in the altercation.
 {¶ 81} In any event, a determination of the identity of the primary aggressor is not an element of the offense of domestic violence. At most, it is relevant only to Mr. Boldin's claim of self-defense, which we have concluded he fails to establish in our review of his second assignment of error. Therefore, the third assignment is overruled.
 {¶ 82} Whether Disorderly Conduct should be Merged with DomesticViolence for Conviction and Sentencing
 {¶ 83} Although Mr. Boldin never argued, at trial or on appeal, that his offenses of disorderly conduct and domestic violence should be merged for conviction, the dissent expresses the view that disorderly conduct is a lesser included offense of domestic violence, and therefore the trial court erred in failing to merge his conviction of disorderly conduct with his conviction for domestic violence. Although Mr. Boldin has waived any claims regarding the merger issue by failing to raise it at any point of the proceedings, we feel compelled to address this issue in light of the dissent's analysis of this issue and recent decisions of the Supreme Court of Ohio.
 {¶ 84} We begin our discussion with the notion of merger and the related notion of allied offenses. "The Double Jeopardy Clauses of the United States and Ohio Constitutions prevent multiple punishments for the same offense." State v. Delfino (1986), 22 Ohio St. 3d 270, 272, citing State v. Jones (1985), 18 Ohio St. 3d 116, 118.
 {¶ 85} Ohio's multiple-count statute, R.C. 2941.25, was enacted to protect against multiple punishments for the same criminal conduct prohibited by the double jeopardy clauses of the United States and Ohio Constitutions. That statute provides: *Page 19 
 {¶ 86} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 87} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 88} As the Supreme Court of Ohio explained in State v. Brown
(2008), 2008-Ohio-4569, the statute is a codification of the judicial doctrine of merger. The court stated:
 {¶ 89} "* * * R.C. 2941.25 is a legislative attempt to codify the judicial doctrine of merger, i.e., the principle that `a major crime often includes as inherent therein the component elements of other crimes and that these component elements, in legal effect, are merged in the major crime.'" Id. at ¶ 42, quoting State v. Botta (1971),27 Ohio St.2d 196, 201. "Therefore, the proper disposition of matters involving allied offenses of similar import committed with a single animus is to merge the crimes into a single conviction." Id.
 {¶ 90} In determining whether a merger of multiple offenses is warranted under R.C. 2941.25, the Supreme Court of Ohio has recognized that the statute requires a two-step analysis. State v. Cabrales,118 Ohio St. 3d 54, 2008-Ohio-1625, ¶ 14. "In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the *Page 20 
commission of the other, the crimes are allied offenses of similar import and the court must proceed to the second step. In the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses." (Emphasis original.) Id., citing State v. Blankenship,38 Ohio St.3d at 117.
 {¶ 91} As to the first step of the analysis, the Supreme Court of Ohio, in State v. Rance (1999), 85 Ohio St.3d. 632, explained that: "[t]he applicable test for deciding [whether two offenses are allied offenses of similar import] is as follows: If the elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import.' If the elements do not so correspond, the offenses are of dissimilar import and the court's inquiry ends — the multiple convictions are permitted." Rance at 636 (citations omitted). When comparing the offenses in the first step of the analysis, the Supreme Court of Ohio instructed that the court should "assess the elements of the offenses in the statutory abstract." Brown at ¶ 20, citingRance at 637.
 {¶ 92} Also, recently in Brown, the Supreme Court of Ohio expanded the first step of the analysis. The court added the additional factor of societal interests protected by the statutes, which the court held should also be considered as part of the analysis of whether offenses are "of similar import" or of "dissimilar import." Id. at ¶ 35-36.
 {¶ 93} Under the two-step analysis, if the offenses are determined to be allied offenses of similar import, it is not the end of the analysis. In order for the merger doctrine to apply, the court must undertake the second step of the analysis, that is, to *Page 21 
review the defendant's conduct and determine if the offenses are committed separately or with separate animus. If the offenses are committed separately or with separate animus, even though they are "of similar import," the defendant may be convicted and sentenced for both offenses. R.C. 2941.25.
 {¶ 94} Thus, when a defendant claims that his multiple offenses should be merged for conviction and sentencing, the court must apply R.C. 2941.25 in a two-step analysis as provided by the Supreme Court of Ohio in Rance and its progeny.
 {¶ 95} As we have pointed out, Mr. Boldin failed to argue at any level that his disorderly conduct offense should be merged with his domestic violence offense for conviction. Therefore he waived any claims regarding merger. See State v. Burge (1992), 82 Ohio App.3d 244, 249
("[a]ppellant did not object at trial to his conviction and sentence on the basis that the offenses with which he was charged were allied offenses of similar import, and so waives the argument on appeal.") See, also, State v. Hooper, 7th Dist. No. 03 CO 30, 2005-Ohio-7084, ¶ 18.
 {¶ 96} Despite Mr. Boldin's waiver of the merger claim, the dissent would hold that the trial court should have merged his conviction of domestic violence with his conviction of disorderly conduct, on the ground that disorderly conduct is a lesser included offense of domestic violence. This conclusion is based on the erroneous assumption that Mr. Boldin's disorderly conduct offense is a lesser included offense of his domestic violence offense.
 {¶ 97} More importantly, in order to determine whether the merger doctrine applies, we are required to apply R.C. 2941.25 in the two-step analysis set forth in Rance and its progeny. As we explain below, under that analysis, Mr. Boldin's offenses *Page 22 
of domestic violence and disorderly conduct are allied offenses of dissimilar import, and therefore, the trial court did not have to merge the two convictions.
 {¶ 98} Whether Disorderly Conduct under R.C. 2917.11(A)(1) is a LesserIncluded Offense of Domestic Violence under R.C. 2919.25(A)
 {¶ 99} First, we address the dissent's assumption that disorderly conduct is a lesser included offense of domestic violence thus necessitating merger. We note that Mr. Boldin was convicted of domestic violence in violation of R.C. 2919.25 (A), which provides that: "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." He was also convicted of disorderly conduct under R.C. 2917.11(A)(1), which provides that "[n]o person shall recklessly cause inconvenience, annoyance, or alarm to another, by * * * engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior[.]"
 {¶ 100} "An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." State v. Deem (1988),40 Ohio St.3d 205, paragraph three of syllabus.
 {¶ 101} As a violation of R.C. 2917.11(A)(1) is a minor misdemeanor and the violation of R.C. 2919.25(A) is a misdemeanor of the first degree, a disorderly conduct carries a lesser penalty than domestic violence. Further, domestic violence must be committed against a "family or household member" and therefore requires the proof an additional element. Thus, the issue remaining under the Deem analysis is whether committing domestic violence under R.C. 2919.25(A), as statutorily defined, always *Page 23 
results in the commission of disorderly conduct under R.C. 1917.11(A). If it does not, the former offense is not a lesser included offense of the latter.
 {¶ 102} The Supreme Court of Ohio, in City of Shaker Heights v.Mosley, 113 Ohio St.3d 329, 2007-Ohio-2072, addressed this issue, although that case involved a different section of the domestic violence statute, R.C. 2919.25(C), which prohibits a "person, by threat of force" from "knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member."
 {¶ 103} Concluding that committing domestic violence under R.C. 2919.25(C) always results in committing disorderly conduct under R.C. 2917.11(A)(1) and therefore the latter is a lesser included offense of the former, the Mosley court distinguished the case before it from several appellate cases[3] which concluded disorderly conduct isnot a lesser included offense of domestic violence. The court pointed out those appellate cases concerned R.C. 2919.25(A) — the section involved in Mr. Boldin's case. Explaining why those appellate cases reached the opposite conclusion, the Supreme Court of Ohio employed the scenario given by those cases in which the perpetrator throws an object at the victim who is not looking at the perpetrator, but misses the target, and thus the victim suffers no inconvenience, annoyance, or alarm. Id. at ¶ 16. Under this scenario, it is possible for an offender to commit domestic violence as statutorily defined, i.e. cause or attempt to cause physical harm, without causing *Page 24 
"inconvenience, annoyance, or alarm" to the victim, since the victim is not aware of the offender's attempt to cause harm. Because of the possibility of a scenario such as this, the commission of domestic violence under R.C. 2919.25 (A) does not always result in the commission of R.C. 2917.11(A)(1).
 {¶ 104} Therefore, Mosley can reasonably be read to imply that the Supreme Court of Ohio considered disorderly conduct under R.C. 2917.11(A)(1) not to be a lesser included offense of domestic violence under R.C. 2919.25 (A), as it carefully pointed out that the defendant in Mosley was convicted of domestic violence under R.C. 2919.25(C), not R.C. 2919.25(A).[4]
 {¶ 105} More importantly, regardless of whether disorderly conduct under R.C. 2917.11(A)(1) is a lesser included offense of domestic violence under R.C. 2919.25 (A), this is the wrong inquiry for a determination of whether merger applies. To determine whether Mr. Boldin's offenses should be merged for conviction and sentencing, we must apply instead R.C. 2941.25 in a two-step analysis given by the Supreme Court in Rance and Brown. In the first step of the analysis, we compare the elements of the two crimes in the statutory abstract to see if the crimes "correspond to such a degree that the commission of one crime will result in the commission of the other." If they do, the crimes are allied offenses of similar import and we move to the next step of the analysis, which assesses if the offenses are committed with a single or multiple animus. If, however, we answer the first question in the negative, the crimes are allied offenses of dissimilar import and the inquiry should end, pursuant to Rance. As noted above, the *Page 25 
Supreme Court of Ohio recently instructed that the factor of societal interests protected by the statutes must also be considered as part of the first step of the analysis — if the protected interests are different, then the offenses are allied offenses of dissimilar import, precluding merger; if the protected societal interests are the same, then we move to the second step of the analysis.
 {¶ 106} Application of the Two-Step Allied Offenses Analysis to Mr.Boldin's Convictions
 {¶ 107} The first step of the analysis asks essentially the same question as the question posed in a lesser included offense analysis, that is, whether, comparing the statutes in the abstract, committing of one crime will always result in committing the other. As illustrated by the scenario employed by the court in Mosley, committing domestic violence under R.C. 2919.25(A) does not necessarily result in committing disorderly conduct under R.C. 2917.11(A)(1). Therefore, these two offenses are allied offenses of dissimilar import.
 {¶ 108} Pursuant to Brown, we then consider whether the two statutes are intended to protect the same societal interests. As domestic violence statutes are enacted to protect a family or household member from harm while disorderly conduct statutes protect the public peace, the societal interests protected by the two statutes are not the same. Therefore these two offenses are allied offenses of dissimilar import and we reach the end of our inquiry — the merger doctrine does not apply to Mr. Boldin's conviction of domestic violence and disorderly conduct.
 {¶ 109} We recognize this outcome appears counterintuitive, because Mr. Boldin is being punished separately for the same conduct. As the Supreme Court itself has *Page 26 
acknowledged, "Rance has produced inconsistent, unreasonable, and, at times, absurd results." Cabrales at ¶ 20. See, also, State v. Cox, 4th Dist. No. 02CA751, 2003-Ohio-1935, quoting State v. Shinn (June 14, 2000), 4th Dist. Nos. 99CA29, 99CA35, 2000 Ohio App. LEXIS 2738, at *30 (after finding involuntary manslaughter and aggravated arson are not allied offenses of similar import and therefore the defendant stood convicted of both crimes based on one occurrence, the court noted "this result seems intuitively wrong [but] the Supreme Court's holding inRance forces us to affirm"). Similarly here, we are bound to apply theRance analysis as set forth by the Supreme Court of Ohio and affirm Mr. Boldin's convictions of domestic violence and disorderly conduct.
 {¶ 110} The judgment of the Chardon Municipal Court is affirmed.
[1] We note at the outset that although Mr. Boldin challenges his convictions of both domestic violence and disorderly conduct in his first, second, and third assignments of error, his brief does not contain a separate argument as to disorderly conduct under these assignments of error, as required by App. R. 16(A)(7). An appellate court may, pursuant to App. R. 12(A)(2), disregard any assignment of error, or any portion of an assignment of error, for which an appellant fails to make a separate argument. See Park v. Ambrose (1993),85 Ohio App.3d 179; State v. Caldwell (1992), 79 Ohio App.3d 667, 677, at fn. 3;State v. Houseman (1990), 70 Ohio App.3d 499, 507. Because Mr. Boldin did not provide any argument in support of his assertion regarding his conviction of disorderly conduct, we do not address it.
[2] The reference to the offense of disturbing the peace in this assignment of error is apparently an error. Mr. Boldin was convicted in this case of domestic violence and disorderly conduct only; he was neither charged nor convicted of the offense of disturbing the peace.
[3] State v. Blasdell, 155 Ohio App.3d 423, 2003-Ohio-6392 andState v. Schaefer (April 28, 2000), 2nd Dist. No. 99 CA 88, 2000 Ohio App. LEXIS 1828.
[4] The dissent cites State v. Kutnar (Sept. 30, 1999), 11th Dist. No. 98-L-117, 1999 Ohio App. LEXIS 4652 for the proposition that disorderly conduct is a lesser included offense of domestic violence. Under a reasonable reading of Mosley, Kutnar is no longer valid.
TIMOTHY P. CANNON, J., concurs in judgment only,